FILED ___ ENTERED
___ LOGGED ___ RECEIVED

APR 3 0 2013

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

BY ___ DEPUTY

## ATTACHMENT A - STATEMENT OF FACTS: KIRK YAMATANI

*The United States and the Defendant agree that if this case proceeded to trial, the United States would prove the following facts below beyond a reasonable doubt. They agree that these are not all of the facts that would be proved if this case proceeded to trial.*

Defendant **KIRK YAMATANI ("YAMATANI")** was a Special Agent of the United States Department of Commerce ("DOC"), Office of the Inspector General ("OIG"), from August 1998 through February 2013. In this role, he was covered by the United States Office of Personnel Management's series 1811, which sets forth requirements for positions that supervise, lead, or perform work involving the planning, conducting, or managing of investigations related to violations of federal criminal laws. Work in this series requires knowledge of criminal investigative techniques, rules of criminal procedures, laws, and precedent court decisions concerning the admissibility of evidence, constitutional rights, search and seizure, and related issues in the conduct of investigations.

**YAMATANI**'s first duty station was in Washington, D.C. In 2006, he transferred to the DOC OIG office in Atlanta, Georgia. In 2009, he returned to Washington, D.C. where he continued to work for DOC OIG. During and after this change of station from Georgia to Washington, D.C., **YAMATANI** defrauded and attempted to defraud the United States and the DOC by submitting false writings and making material misrepresentations to the DOC while seeking reimbursement for relocation expenses. **YAMATANI** submitted these false writings to National Institute of Standards and Technology ("NIST") Office of Financial Resource Management, a division of the DOC located in Gaithersburg, Maryland, which processed DOC OIG's travel claims.

On or about May 1, 2009, **YAMATANI** applied for and was granted relocation benefits from the DOC because his transfer from Atlanta to Washington, D.C. was determined to be in the government's interest. **YAMATANI**'s authorized relocation benefits included reimbursement for a househunting trip, *en route* travel, and temporary quarters subsistence expenses ("TQSE"). Approval of these reimbursements was contingent on **YAMATANI**'s adherence to the Federal Travel Regulation.

Contemporaneous e-mail communications between **YAMATANI** and **Rachel Ondrik**, a fellow DOC OIG agent also relocating from Atlanta to Washington at the same time, show that both agents were aware of the rules and regulations governing their relocations and reimbursements for related expenses, yet both **YAMATANI** and **Ondrik** nevertheless attempted to secure payment from the DOC in amounts exceeding that authorized by the governing regulations. For example, in an e-mail exchange on May 6, 2009, **YAMATANI** and **Ondrik** agreed that the Federal Travel Regulation permitted a certain method of reimbursement, known as the "fixed rate" method, for a period of time limited to 30 days, with no extensions permitted. Although **YAMATANI** and **Ondrik** agreed that their supervisors at OIG were unaware of the temporal limitation on this entitlement, **YAMATANI** and **Ondrik** agreed to conceal these limitations from DOC OIG and to seek reimbursements in excess of what the regulation authorized.

Further, on or about June 10, 2009, **YAMATANI** knowingly submitted a false travel voucher seeking reimbursement of $3,589 for a ten-day househunting trip he claimed that he and his wife took to the Washington, D.C. area. On the voucher, **YAMATANI** claimed that they departed their Georgia home on the morning of May 28, 2009, drove their personal vehicle to Ashburn, Virginia, and then later returned by car to Georgia on June 6, 2009. In the voucher for this househunting trip, **YAMATANI** claimed reimbursement for various expenses, such as lodging, meals, mileage, and "parking, tolls, etc." In fact, **YAMATANI** did not make a househunting trip during this period, nor did the actual househunting trip he took last ten days, nor did he incur the claimed expenses. **YAMATANI** nonetheless knowingly submitted the voucher containing that false statement to DOC OIG and NIST.

On or about June 10, 2009, **YAMATANI** submitted false travel vouchers seeking reimbursement of $1,531 for his official en route travel to his new duty station, and on or about July 27, 2009, **YAMATANI** submitted a false TQSE voucher. **YAMATANI**'s en route voucher claimed that he and his family departed their Georgia home on June 7, 2009 at 12:00 p.m. and drove their personal vehicle to Ashburn, Virginia, arriving at 10:00 p.m. On his voucher, **YAMATANI** claimed reimbursement for mileage, "other travel," and "miscellaneous expenses." **YAMATANI** was aware that both vouchers contained false information when he completed them and submitted them to DOC OIG and NIST. Altogether, **YAMATANI** submitted at least three false vouchers seeking reimbursement from the United States for $36,305.57.

When NIST personnel discovered that initial payments made on **YAMATANI**'s vouchers were in excess of his actual entitlements under the Federal Travel Regulation, NIST denied them and began recouping overpayments. **YAMATANI**, however, persisted in his claims for reimbursement, despite the fact that he knew that all three vouchers contained false information. On several occasions from 2009 to 2011, **YAMATANI** reaffirmed the earlier false statements in his vouchers and made false statements regarding the circumstances of his claims for reimbursement, which constituted obstructive conduct.

Between June 2009 and February 2011, **YAMATANI** further committed several instances of time and attendance fraud against his agency. The actual loss to the United States that was the direct and proximate result of **YAMATANI**'s knowing and intentional conduct was approximately $14,000.

I have read this statement of facts, and have carefully reviewed it with my attorney. I acknowledge that it is true and correct.

4/30/13
Date

Kirk Yamatani

I am Kirk Yamatani's attorney. I have carefully reviewed the statement of facts with him.

30 April 2013
Date

Steven Levin, Esq.

2